## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: § | Case No. 13-10532 | |
| § | | |
| RONNIE G. CROFT and § | CHAPTER: 13 | |
| BEVERLY S. CROFT § | | |
| § | | |
| DEBTORS. § | | |
| § | | |
| CASH FLOW FINANCIAL LLC § | | |
| Plaintiff, § | | |
| § | | |
| vs. § | ADVERSARY PROCEEDING | |
| § | NO. _____ | |
| RONNIE G. CROFT and § | | |
| BEVERLY S. CROFT § | | |
| Defendant. § | | |
| § | | |

## CASH FLOW FINANCIAL LLC'S ORIGINAL COMPLAINT

Cash Flow Financial LLC, by and through its undersigned counsel, and pursuant to 11 U.S.C. 1306, files this, its Original Complaint initiating this adversary proceeding (the "Adversary"), and alleges as follows:

### I.    PARTIES

A.    The Plaintiff

1.    Cash Flow Financial LLC ("Plaintiff" or "Cash Flow") is a Texas limited liability company, with its principal place of business located at 6101 Long Prairie Rd., Ste. 744, Flower Mound, Texas 75028.

B.    The Defendant(s)

2. Debtors Ronnie G. Croft and Beverly S. Croft ("Croft" or "Debtor(s)" or "Defendant(s)") are residents of the State of Texas and may be served through their counsel of record, Robert E. Barron, P.O. Box 1347, Nederland, Texas 77627.

## II.    JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 in that this action arises under, arises in and/or relates to cases pending under Chapter 13 of the Bankruptcy Code.

4. Defendant(s) is/are subject to personal jurisdiction in this Court.

5. This action is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (K), (M), and (O). Accordingly, this Court may enter final orders and judgments under 28 U.S.C. § 157.

6. Venue is proper in this District pursuant to 28 U.S.C. §§1408 and/or 1409 because the case is pending in this District.

7. The Court has authority to grant the relief requested in this Complaint pursuant to the Bankruptcy Code.

## III.    FACTUAL BACKGROUND

8. Debtor Ronnie Croft is a sole proprietor operating several restaurants doing business as "Captain Ron's Seafood, Beaumont", "Captain Ron's Seafood, Woodville", "Captain Ron's Seafood, Kountz", and "Ron's Outpost BBQ" (cumulatively the "Restaurants"). In the course of business, the Restaurants receive payment for goods and services via credit and debit cards.

9. Cash Flow is in the business of providing working capital for merchant businesses.

10. From March 2013 through September 2013, in six separate transactions, Cash Flow entered into various agreements with the Debtors to purchase future credit card receivables relating to the Restaurants. True and correct copies of the agreements are attached hereto as Exhibit 1.

11. Pursuant to the terms of the agreements, Cash Flow purchased $75,920.00 of the Debtors' credit and debit card receivables for a total purchase price of $58,424.00.

12. Specifically, the Receivable Transfer Agreement states:

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Merchant hereby sells, assigns and transfers to the Company, Merchant's interest in the percentage specified below and on each Rider attached hereto (the "Specified Percentage") of each of its future credit card receivables (the "Future Receivables") due to Merchant from a credit card processor acceptable to the Company ("Processor") until the amount specified below and on each Rider (the "Specified Amount") of Future Receivables has been delivered by Merchant to the Company.

See Exhibit 1.

13. Croft further agreed in the Receivable Transfer Agreement to:

(i) to conduct its business consistent with past practice (ii) to exclusively use Processor for the processing of all of its credit card transactions; (iii) not to take any action to discourage the use of credit cards or to permit any event to occur which could have an adverse effect on the use, acceptance or authorization of credit cards for the purchase of Merchant's services and products; (iv) not to change its arrangements with Processor in any way which is adverse to the Company; (v) not to take any action that has the effect of causing the credit card processor through which the major credit cards are settled to be changed from Processor to another credit card processor; and (vi) not to sell, dispose, convey or otherwise transfer its business or assets without the express prior written consent of the Company and the assumption of all of Merchant's obligations under this Agreement pursuant to documentation reasonably satisfactory to the Company.

See Exhibit 1.

14. Although not required to do so, Cash Flow, through its registered assumed name "Alegria Enterprises", previously recorded a UCC-1 financing statement giving notice of its interest in Croft's personal property, including credit and debit card receivables saying "<u>All of Secured Party's [Cash Flow] right, title and interest in and to presently existing and future credit card receivables due to Debtors' from Debtors' credit card processors which are sold from time to time. The sale of future credit card receivables is intended to be a sale and not an assignment for security.</u>" *See* Exhibit 2.

15. Cash Flow, in performance of its contractual obligations, delivered $58,424.00 in working capital to the Debtors. The future receivables which Cash Flow had purchased were to be delivered by Debtors daily directly from a credit card processor approved by Cash Flow.

16. On October 3, 2013, Debtors filed for protection under Chapter 13 of Title 11 of the United States Code, in the United States Bankruptcy Court for the Eastern District of Texas, Beaumont Division. After the petition was filed, and without authority from Cash Flow, the Debtors changed credit card processing companies and Cash Flow no longer received payments of the acquired accounts receivable.

17. Regardless of the Debtors' bankruptcy filing, Cash Flow has an ownership interest in a portion of the credit and debit card receivables being generated by the Restaurants, and therefore files this complaint seeking to recover same, as well as any other relief to which it is justly entitled.

IV. <u>CAUSES OF ACTION</u>

*Count 1 – Request for Declaratory Judgment*

18. Cash Flow incorporates the paragraphs above as if fully set forth herein.

19. There is a present and actual dispute between Cash Flow and the Debtors concerning the right, title and ownership to the Debtors' post-petition credit and debit card receivables.

20. Courts have long recognized that the "'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 450-51 (2007) (citing *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (quoting *Butner v. United States,* 440 U.S. 48, 57, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); citation omitted)). As was stated in *Butner,* "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S., at 55; accord, *Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law").

21. Here, Texas law makes it clear that the transactions at issue were not loans, but rather true sales of accounts receivable. *See* TEX. FIN. CODE §306.103. Further, being sales of accounts, these transactions are governed by UCC Chapter 9. *See* TEX. BUS. & COMM. CODE §9.109(a)(3). Chapter 9 states that "the parties' characterization of a transaction as a sale of such assets shall be conclusive that the transaction is a sale and is not a secured transaction and that title, legal and equitable, has passed to the party

characterized as the purchaser of those assets regardless of whether the secured party has any recourse against the debtor, whether the debtor is entitled to any surplus, or any other term of the parties' agreement." TEX. BUS. & COMM. CODE §9.109(e).  Chapter 9 further states that "[a] debtor that has sold an account…does not retain a legal or equitable interest in the collateral sold." TEX. BUS. & COMM. CODE §9.318(a).

22.     Here, the transactions were undeniably sales and purchases of future accounts receivable; therefore they should be treated as assets of Cash Flow, not the Debtors, as mandated by Texas law.

23.     Notwithstanding Cash Flow's purchase of a portion of the Debtors' credit and debit card receivables, the Debtors stopped causing the delivery of those receivables to Cash Flow, despite the fact that the Debtors continue to generate credit and debit card receivables during the course of the operation of the Restaurants.

## V.     PRAYER FOR RELIEF

WHEREFORE Cash Flow respectfully requests that the Court enter an order providing for the following:

(a) a declaratory judgment that Cash Flow is the owner of 20% (or 16% depending on the terms of the agreement) of the Debtors' post-petition credit and debit card receivables;

(b) a declaratory judgment finding that the portion of the Debtors' post-petition credit and debit card receivables in which Cash Flow has all right, title and interest is not property of the Debtors' bankruptcy estate within the meaning of 11 U.S.C. § 541 insofar as Cash Flow is the owner of those receivables;

(c) temporary injunctive relief compelling the Debtors to segregate that portion of the Debtors' credit and debit card receivables in which Cash Flow claims an interest and ordering that those funds shall be held pending the resolution of this adversary proceeding;

(d) permanent injunctive relief compelling the Debtors to comply with the terms of the Receivable Transfer Agreements by delivering to Cash Flow that portion of the credit and debit card receivables to which it is entitled under those agreements for so long as this case remains pending and under any confirmed Chapter 13 plan until the full amount of receivables is delivered to Cash Flow;

(e) equitable relief in the form of an accounting by the Debtors of all credit and debit card receivables received by the Debtors between the Petition Date and the date of entry of judgment herein;

(f) an administrative expense claim under 11 U.S.C. § 503 for any amounts retained by the Debtors between the Petition Date and the date of entry of judgment herein that should have been delivered to Cash Flow under the terms of the Receivable Transfer Agreements, and the receipt of which benefited on the Debtors' bankruptcy estate;

(g) and, granting any other legal or equitable relief that the Court deems just and proper under the premises.

Respectfully submitted,

**PAGEL, DAVIS & HILL, P.C.**

　/s/ Martyn B. Hill　
Martyn B. Hill
Bar Card No. 09647460
Michael A. Harris
Bar Card No. 24046030
1415 Louisiana, 22nd Floor
Houston, Texas 77002
Telephone:   713/951-0160
Facsimile:    713/951-0662
ATTORNEYS FOR CASH FLOW
FINANCIAL LLC

## **CERTIFICATE OF SERVICE**

    I hereby certify that on this 12th day of November 2013, a copy of the foregoing Notice of Appearance and Request for Service of all Papers was served through the ECF system of the U. S. Bankruptcy Court for the Eastern District of Texas upon all parties requesting service by same.


                                                          __/s/ Martyn B. Hill_____
                                                          Martyn B. Hill